**Electronically Filed
Intermediate Court of Appeals
29963
29-DEC-2011
08:43 AM**

NO. 29963

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
DUSTIN KAMAKI JIMENEZ, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 07-1-1008)


MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Reifurth, JJ.)



Defendant-Appellant Dustin Kamaki Jimenez (Jimenez) appeals from the Judgment of Conviction and Sentence (Judgment) filed in the Circuit Court of the First Circuit (Circuit Court).[1] The prosecution of Jimenez by Plaintiff-Appellee State of Hawai'i (State) stemmed from the shooting death of Dillon Ching (Dillon). A jury found Jimenez guilty as charged of (1) second-degree murder (Count 1); (2) carrying or use of a firearm in the commission of a separate felony (Count 2); (3) place to keep a pistol or revolver (Count 3); (4) first-degree terroristic threatening (Count 5); and (5) first-degree reckless endangering (Count 6).[2]

---

[1] The Honorable Richard K. Perkins presided.

[2] Jimenez was also originally charged in Count 4 with being a person under indictment for a felony who possessed ammunition, but the State moved for a nolle prosequi of that count, without prejudice, which the Circuit Court granted.

After the jury's verdicts were entered, Jimenez filed a motion for a new trial.  Jimenez's new trial motion was based on a claim of newly discovered evidence, namely, the testimony of a witness, Tony Bumphus (Bumphus), who had not been called at trial.  Jimenez contended that Bumphus's testimony would support Jimenez's justification defenses of the use of force in self-defense and the defense of others and Jimenez's claim of extreme mental or emotional disturbance.  After holding an evidentiary hearing, the Circuit Court denied Jimenez's motion for a new trial.  The Circuit Court sentenced Jimenez to concurrent terms of imprisonment of life with the possibility of parole on Count 1; twenty years on Count 2; ten years on Count 3; and five years on Counts 5 and 6.  The Circuit Court also imposed mandatory minimum terms for use of a firearm of fifteen years on Count 1 and three years on Counts 5 and 6.

On appeal, Jimenez only challenges the Circuit Court's denial of his motion for a new trial.  Jimenez argues that the Circuit Court erred in ruling that he failed to prove that: (1) the defense could not have discovered Bumphus's testimony through the exercise of due diligence before or at trial; and (2) the proffered evidence was of such a nature as would probably change the result of a later trial.  For the reasons discussed below, we hold that the Circuit Court did not err in denying Jimenez's motion for a new trial.

BACKGROUND

I.

A.

Dillon was shot twice in a lot adjacent to his residence in the midst of a melee involving two groups that had begun before Dillon arrived home.  He died en route to the hospital.  Dillon lived on the North Shore in a residence (the Ching residence) with his father, his wife Desiree Ching (Desiree), his son, and his two brothers, Billy Jack Ching (Billy Jack) and T.Y. Ching (T.Y.).  The Ching residence was near a beach known as Log Cabins.

On the night in question, Billy Jack, T.Y., Blake Wabinga-Akui (Blake), Blake's brother Brandon Wabinga (Brandon), and other friends were drinking at the Ching residence. Dillon, Desiree, and their son were not at home. A group of about twenty to thirty people, including Jimenez, were drinking on the beach at Log Cabins. Blake and T.Y. went to Log Cabins to "check things out because it looked like a party." When Blake and T.Y. returned to the Ching residence, they were angry because they felt the people at Log Cabins had mistreated them, and Blake wanted to fight.

Blake was in an empty lot adjacent to the Ching residence when he saw Wesley Tamanaha (Wesley), who was with the group drinking at Log Cabins, walking from the beach. Blake and Wesley exchanged words and Blake punched Wesley. Wesley fell to the ground and started yelling out for his "boys." Wesley got up, and Blake hit Wesley again. A group of people came from the beach towards the Ching residence and started throwing beer bottles at Blake. Once the group of people from the beach started throwing bottles, Brandon went to retrieve an aluminum bat. The group from the beach began fighting with the people from the Ching residence. Dillon, Desiree, and their son returned home while the fighting was underway.

According to Desiree, Jimenez was standing in the middle of the street near the empty lot adjacent to the Ching residence. She heard Jimenez yelling and a gunshot, and she saw Jimenez holding a gun. Dillon was standing next to Brandon in the empty lot. Dillon did not have anything in his hands. Jimenez faced Dillon, pointed the gun in Dillon's direction, and said, "[W]hat, you want to act, fucker? You want to act?" As Jimenez said these words, he fired two shots at Dillon. Jimenez was five to six feet from Desiree and fifteen to twenty feet from Dillon when he fired the shots. Desiree did not see Dillon make any move toward Jimenez or pick anything up before Jimenez fired the shots. After the two shots were fired, Desiree saw that

Dillon was bleeding. Dillon walked toward Desiree and fell to the ground as he reached her.

According to Brandon, after retrieving the bat, he swung the bat at four or five people who were in front of him to keep them at bay, but did not hit anyone. Brandon heard gunshots and threw the bat away to avoid being shot. Brandon saw Jimenez holding a gun in the middle of the street "talking shit, saying stuff about Wahiawa[.]" Brandon was in the empty lot when Dillon approached him and asked what was going on. Dillon did not have anything in his hands. Jimenez turned and pointed the gun in their direction, at which point Brandon ran back toward the Ching residence. Brandon heard two or three more shots after he ran. Brandon then saw Dillon on the ground and bleeding.

Dillon was taken by ambulance to Wahiawā General Hospital, and passed away en route. An autopsy was performed, which revealed that Dillon had two gunshot wounds to his right chest, one of which was fatal. According to the medical examiner, the angle of the non-fatal gunshot wound indicated that Dillon "would have had to like duck when [the bullet] entered" and was consistent with Dillon being at a slightly crouched angle. The fatal gunshot wound was at an even more acute angle, indicating that Dillon was "bent at a 90-degree angle" when the bullet entered his body. Dillon "bled to death from injuries to his lung as a result of the gunshot wound to the chest."

At trial, numerous individuals who had been drinking at the Ching residence and on the beach at Log Cabins on the night in question were called as witnesses. Several witnesses testified that Dillon did not have anything in his hands that night, and none of the witnesses testified to seeing Dillon with a bat in his hands.

B.

Jimenez testified in his own defense at trial. Jimenez did not dispute that he had shot and killed Dillon. Jimenez's defense was based on his claim that he shot Dillon in self-

defense, in the defense of others, or as the result of extreme mental or emotional disturbance (EMED).

Jimenez testified that on the night in question he saw a group of his friends at California Market in Wahiawā and they decided to go to the North Shore to drink beer.  Jimenez ended up joining and drinking with a group of twenty to thirty people, which included his friends, at the beach.  Jimenez was carrying a firearm, a nine millimeter handgun.

During that evening, Jimenez went to the aid of his friend Wesley, who was being assaulted by Blake.  Jimenez threw a bottle at Blake to get Blake off of Wesley.  Jimenez testified that Blake was "calling us out" to fight.  People from the beach were throwing bottles, and "[e]verybody just started fighting . . . . [j]ust rushing each other, throwing fist."  Jimenez walked toward the empty lot and estimated that about fifteen people were fighting.

According to Jimenez, he saw two people carrying bats. One of them was Brandon, but Jimenez did not know who the other person was.  The situation was chaotic and scary, and Jimenez "was kind of jumpy" and his "heart was pumping."  Jimenez pulled out his gun and fired it into the air to "scare everybody off" and "break 'em up."  Jimenez saw Brandon with the bat in the empty lot and told Brandon to "[p]ut down the fucking bat."

Jimenez testified that he next "seen like one flash, somebody running towards -- towards me" from his left side. Jimenez turned and fired.  Jimenez testified that he "just reacted" and fired in a split second without thinking what he wanted to do.  Jimenez estimated that the person was six to eight feet away when Jimenez shot.  Jimenez did not testify that he fired the gun at the person because he saw the person carrying a bat.  Rather, Jimenez stated, "I thought he had one bat.  I thought that was the other guy with the bat.  I wasn't sure." Jimenez asserted that he did not have the chance to look at the guy's face before he shot and that he fired the gun because he "was just scared that [the guy] had one bat and, you know, he

probably going to bash my head in[.]" After Jimenez fired his gun, Jimenez ran to his car, picked up his friend Kyle, and left the scene. Jimenez testified that he told Kyle, "I think I shot somebody because I thought they had one bat."

On cross-examination, Jimenez maintained that he just reacted, turned, and fired the gun when he saw someone running towards him "real fast." Jimenez acknowledged that he could have left prior to firing the shots; that he did not see any of his friends get hit with a bat; that he was never hit with a bottle or a bat; and that no one came close to hitting him with a bat.

C.

The jury returned verdicts of guilty as charged on all counts presented to them for deliberation (Counts 1, 2, 3, 5, and 6), including for second-degree murder charged in Count 1.

II.

A.

After the entry of the guilty verdicts, Jimenez filed a motion for a new trial based on newly discovered evidence. Jimenez asserted that the newly discovered testimony of Tony Bumphus, who purportedly had been a witness to the shooting, would support Jimenez's defenses of self-defense and the defense of others and his EMED claim and thus warranted a new trial.

The Circuit Court held an evidentiary hearing on Jimenez's new trial motion. At the hearing, Jimenez testified that he had known Bumphus since childhood and described Bumphus as an "acquaintance." Jimenez stated that on the night of the shooting, he had not seen Bumphus at the Log Cabins area or around the scene of the assault. Jimenez testified that he did not include Bumphus on a list he provided to defense counsel of "persons who might have been present or might know something about the case" because Jimenez "didn't even know [Bumphus] was there." Jimenez also testified that he had not received information from anyone that Bumphus had been present at the beach or at the time of the shooting.

During cross examination, Jimenez acknowledged that Bumphus is "a big guy"; that he is tall; and that he could have weighed about 280 to 300 pounds. Jimenez admitted that Bumphus was "hard to forget."

Bumphus testified that he had known Jimenez for about ten years, described their relationship as close, and said they were friends. When asked about the shooting incident, Bumphus testified that he was at the beach with a lot of people, including Jimenez. He had been there for about thirty minutes when he heard a commotion. He ran over to investigate and saw a person he knew as "Wes" on the ground with two guys "backing off [Wes]."

According to Bumphus, he challenged the two guys to fight. Bottles were thrown at the two guys from the beach side and they retreated toward an empty lot. Bumphus walked toward the two guys and continued to challenge them, and he saw a guy with a bat in his hand. At that point, Bumphus noticed that Jimenez was standing right next to him. The guy with the bat was swearing at Bumphus, and Bumphus replied, "Fuck you, come, bring your bat." The guy with the bat was holding it as if he was getting ready to swing.

Bumphus testified that Jimenez ran and left the scene, and he came back a few seconds later. When Jimenez returned, Bumphus heard a gunshot that Jimenez had fired. Jimenez was standing next to Bumphus, about two feet away, when Jimenez fired the shot. Bumphus testified to what happened next:

> That first shot is fired, he -- the guy with the baseball bat didn't like -- didn't care about the shot. So then he started to walk up to us. He started walking to us, not fast, wasn't running to us, but he was walking to us real slowly. And then that's when I heard another shot.

Bumphus stated that he was sure that the guy still had the bat in his hand as the guy was approaching them. Jimenez shot and the guy with the bat "got shot and fell back." Upon seeing the guy fall back, Bumphus ran to his car and left the scene. He did not attempt to contact Jimenez about the shooting, but approached Jimenez's lawyer after the trial.

On cross-examination, Bumphus stated that he was six feet five inches tall and weighed about 260 pounds at the time of the shooting incident.[3/] Bumphus elaborated on his contacts with Jimenez on the night of the shooting. Bumphus testified that he had seen Jimenez at a store in Wahiawā and Jimenez told him about the beach party. Bumphus decided to go and followed Jimenez to the party. Bumphus testified that later, he and Jimenez went on a "beer run." Only Bumphus and Jimenez were in the car during the beer run and they talked to each other. Bumphus also testified that he and Jimenez talked to each other prior to the shooting while they were on the beach drinking. Bumphus stated that after the fighting broke out, he was standing next to Jimenez, with a distance of two feet between them, and Jimenez was aware of Bumphus's presence. Bumphus testified that the guy with bat was initially about fifteen feet from Bumphus and Jimenez, then slowly approached to about ten feet of them, and then approached a bit more slowly after Jimenez fired the first shot in the air.

Bumphus admitted that he sat in the courtroom almost every day during Jimenez's trial and heard witnesses' testimony. Bumphus acknowledged that he heard a few days after the shooting that Jimenez had been arrested and accused of murder. However, he did not contact anyone to let them know what he had seen until he approached Jimenez's attorney after the jury had rendered its guilty verdicts.

The Circuit Court orally denied Jimenez's motion for a new trial. Citing State v. McNulty, 60 Haw. 259, 588 P.2d 438 (1978), the Circuit Court stated that a motion for a new trial based on newly discovered evidence will only be granted if the defendant shows:

> one, the evidence has been discovered after trial; two, such evidence could not have been discovered before or at trial through the exercise of due diligence; three, the evidence is material to the issues and not cumulative or offered

---

[3/] Jimenez testified at trial that Jimenez was about five feet four inches tall and weighed about 150 pounds.

solely for purposes of impeachment; and, four, the evidence is of such a nature as would probably change the result of a later trial.

The Circuit Court concluded that Jimenez had failed to prove the second and fourth requirements. On June 25, 2009, the Circuit Court imposed sentence on Jimenez and entered its Judgment.

On July 22, 2009, the Circuit Court filed written "Findings of Fact, Conclusions of Law and Order Denying Motion by Defendant Jimenez for New Trial" (Order Denying New Trial Motion). The Order Denying New Trial Motion provides in pertinent part as follows:

[T]he Court being fully advised in the premises, and having orally denied [Jimenez's motion for a new trial], makes the following findings of fact:

. . . .

2. Assuming[,] *arguendo*, that what Mr. Bumphus said on the witness stand [during the hearing on Jimenez's motion for a new trial] concerning his contact with the defendant on the night of the shooting is credible, then the defendant's claim that he had no contact with Mr. Bumphus that night is not credible.

3. The Court finds that the defendant has not established that he was unaware of Mr. Bumphus' presence on the night of the shooting. This being the case, due diligence should have resulted in the discovery of the evidence before or during the trial, especially in light of the fact that Mr. Bumphus was present in court during some of the trial proceedings.

4. Mr. Bumphus would be the only witness at trial to place a bat in the hand of Dillon Ching just before he [Dillon Ching] was shot. Given this, Mr. Bumphus' testimony would neither be merely cumulative nor offered for impeachment purposes.

6.[sic] None of the individuals who testified at the trial, and those individuals include the defendant, indicated that Dillon Ching was holding a bat when he [Dillon Ching] was shot.

7. None of them mentioned seeing Mr. Bumphus or anyone resembling him at the beach up on the road during the fight or standing next to the defendant when the fatal shots were fired.

8. None of them placed Dillon Ching on the scene as early in the sequence of events as Mr. Bumphus does.

9. None described him [Dillon Ching] as approaching the defendant slowly, head on, five feet at a time and carrying a bat as Mr. Bumphus does.

9

10.   Mr. Bumphus' testimony contradicts not only the testimony of the State's witnesses, but also the testimony of the defendant himself.

11.   This is apart from questions that might be raised concerning his [Mr. Bumphus] attending the trial and hearing the testimony of other witnesses and why he waited so long before coming forward.

CONCLUSIONS OF LAW

1.   A motion for new trial based on newly discovered evidence will be granted only if all of the following requirements have been satisfied: (1) the evidence has been discovered after trial; (2) such evidence could not have been discovered before or at trial through the exercise of due diligence; (3) the evidence is material to the issues and not cumulative or offered solely for purposes of impeachment; and (4) the evidence is of such a nature as would probably change the result of a later trial.  State v. McNulty, 60 Haw. 259 (1978).

. . . .

3.   Based on [Findings of Fact (FOF)] no.'s 2 and 3, the due diligence factor has not been proved.

. . . .

5.   Based on FOF no.'s 5 through 11, the Court is not of the belief that the evidence being offered by the defense is of a nature that would probably change the result of the trial.

ORDER

IT IS THEREFORE HEREBY ORDERED that, the foregoing motion is hereby denied.

(Brackets surrounding "Dillon Ching" in original.)

DISCUSSION

Jimenez argues that the Circuit Court erred in denying his motion for a new trial, which was based on newly discovered evidence.  In particular, Jimenez argues that the Circuit Court erred in ruling that he failed to prove: (1) that the defense could not have discovered Bumphus's testimony through the exercise of due diligence before or at trial; and (2) the proffered evidence was of such a nature as would probably change the result of a later trial.

10

Hawai'i Rules of Penal Procedure (HRPP) Rule 33 (1977) provides in relevant part that "[t]he court on motion of a defendant may grant a new trial to him if required in the interest of justice." The Hawai'i Supreme Court has held that

> [a] motion for new trial based on newly discovered evidence will be granted only if all of the following requirements have been satisfied: (1) the evidence has been discovered after trial; (2) such evidence could not have been discovered before or at trial through the exercise of due diligence; (3) the evidence is material to the issues and not cumulative or offered solely for purposes of impeachment; and (4) the evidence is of such a nature as would probably change the result of a later trial.

McNulty, 60 Haw. at 267-68, 588 P.2d at 445 (1978), overruled on other grounds by Raines v. State, 79 Hawai'i 219, 900 P.2d 1286 (1995). A criminal defendant bears the burden of proof on all these requirements. See United States v. Turner, 995 F.2d 1357, 1364 (6th Cir. 1993) (analyzing Federal Rule of Criminal Procedure Rule 33, which in pertinent part was substantially similar to HRPP Rule 33). A decision on a motion for a new trial is within the sound discretion of the trial court and will not be overturned on appeal absent a clear abuse of discretion. McNulty, 60 Haw. at 268, 588 P.2d at 445, overruled on other grounds by Raines, 79 Hawai'i 219, 900 P.2d 1286.

Because Jimenez has the burden of proof on all four of the McNulty requirements, we may affirm the Circuit Court's decision if we conclude that it did not abuse its discretion in ruling that Jimenez failed to meet his burden on either the second or fourth McNulty requirement.

I.

We begin by evaluating the Circuit Court's ruling that Jimenez failed to meet his burden of proving the fourth McNulty requirement. The Circuit Court ruled that Jimenez failed to prove that Bumphus's testimony (the new evidence proffered by Jimenez) was "of a nature that would probably change the result of the trial." We conclude that in making this ruling, the Circuit Court did not abuse its discretion.

The Circuit Court found that Bumphus's testimony was not only inconsistent with that of the numerous eye-witnesses who testified at trial, but also contradicted Jimenez's testimony. These findings are supported by the record. Bumphus was the only person to say that Dillon had a bat in his hands before Jimenez shot him. At trial, several witnesses testified that Dillon had not been holding anything in his hands, and none of the trial witnesses, including Jimenez, testified that Dillon was holding a bat when he was shot. More importantly, the contrast and differences between Bumphus's testimony and Jimenez's testimony were so great that it appears unlikely that both could be found to be credible.

Bumphus is a large individual, standing six feet five inches tall and weighing about 260 pounds at the time of the charged offense -- someone who Jimenez acknowleged would be "hard to forget" if he were present. At the hearing on the new trial motion, Bumphus testified that he had known Jimenez for a long time and they were friends; that Jimenez had seen Bumphus in Wahiawā and invited Bumphus to a beach party on the North Shore; that Bumphus had followed Jimenez to the party; that later Bumphus and Jimenez went together on a beer run in a car in which they were the only two occupants; that they talked to each other in the car and at the beach party; that Jimenez was standing next to Bumphus when a guy with a bat was swearing at them; that Jimenez ran away then returned seconds later and resumed standing next to Bumphus; and that with Bumphus standing next to Jimenez (about two feet away), Jimenez shot the guy with the bat as the guy was slowly approaching them. In sharp contrast, Jimenez testified at the hearing that while he had known Bumphus since childhood, he had not seen Bumphus at the Log Cabins beach or the scene of the shooting and "didn't even know [Bumphus] was there."

As the Circuit Court found, "[a]ssuming[,] *arguendo*, that what Mr. Bumphus said [during the hearing on Jimenez's

motion for a new trial] concerning his contact with the defendant on the night of the shooting is credible, then the defendant's claim that he had no contact with Mr. Bumphus that night is not credible." The Circuit Court's finding highlights the striking conflict between the testimonies of Bumphus and Jimenez. It is difficult to see how Jimenez could fail to remember Bumphus's presence during the shooting incident if Bumphus's testimony regarding his close interaction with Jimenez that evening were true.

In addition to the conflict over Bumphus's actual presence at the scene of the shooting incident, Bumphus's version of the shooting was inconsistent with Jimenez's version. Bumphus testified that the guy who was shot was walking towards them "real slowly" when Jimenez fired the gun. Jimenez testified that he fired in a split-second reaction because he saw someone running towards him "real fast."

Given the irreconcilable differences between Bumphus's testimony and Jimenez's version of events as well as the inconsistency between Bumphus's testimony and that of the eye-witnesses who testified at trial, the Circuit Court did not abuse its discretion in concluding that Jimenez failed to prove the fourth McNulty requirement. The stark differences between the testimonies of Bumphus and Jimenez were so great that the testimony of one would have served to strongly impeach and cast severe doubt on the testimony of the other. The conflict between Bumphus's testimony and Jimenez's own version of events made it highly unlikely that Bumphus's testimony would change the result if a new trial were held.

Moreover, any potential favorable value to Jimenez's defense arising out of Bumphus's testimony that Dillon was carrying a bat when Jimenez shot him was effectively blunted by Jimenez's trial testimony. Jimenez testified at trial that he turned and fired in a split-second reaction, without thinking or

having a chance to look at the guy's face, when he saw someone running towards him real fast from his left side. When Jimenez fired, he was not even sure that the guy approaching him was the same person he had previously seen with a bat. Jimenez did not testify that he saw the guy approaching him with a bat before he fired or that he based his decision to fire on seeing the guy running towards him carrying a bat.

In light of Jimenez's trial testimony, Bumphus's testimony that Dillon was carrying a bat immediately before Jimenez shot Dillon would not have substantially affected Jimenez's defenses or his EMED claim. Jimenez's testimony shows that he did not shoot because he saw Dillon carrying a bat, but rather that he fired without actually being aware of whether or not Dillon was carrying a bat. Thus, whether Dillon was actually carrying a bat, as Bumphus claimed in his testimony, would not have served to meaningfully advance Jimenez's defenses of self-defense or the defense of others, or his EMED claim, because it was not a factor in Jimenez's decision to shoot.

II.

As noted, Jimenez was required to satisfy all four McNulty requirements in order to be entitled to a new trial. Because we conclude that the Circuit Court did not abuse its discretion in determining that Jimenez did not satisfy the fourth McNulty requirement (the proffered evidence was of such a nature as would probably change the result of a later trial), we need not address whether the Circuit Court erred in ruling that Jimenez also failed to satisfy the second McNulty requirement (Bumphus's testimony could not have been discovered by the defense through the exercise of due diligence before or at trial).

14

CONCLUSION

We conclude that the Circuit Court did not err in denying Jimenez's motion for a new trial. We affirm the June 25, 2009, Judgment of the Circuit Court.

DATED: Honolulu, Hawai'i, December 29, 2011.

On the briefs:

Chester M. Kanai
for Defendant-Appellant

Loren J. Thomas
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*

Chief Judge

*Alexa D.M. Fujise*

Associate Judge

*Lawrence M. Reifurth*

Associate Judge

15